Good morning, Your Honors. I'd like to reserve three minutes for rebuttal. May it please the Court, I'm Marsha Paul from Davis-Wright-Tremaine, together with Carla Deltman, on behalf of Appellant Playtex. This is a case about diaper odor. It's all right. I had a trial once on kitty litter many years ago. Well, there are advertising cases about kitty litter as well. And we had people that testified as to what kitty litter, you know, best covered up the odor of cat wee-wee. Well, we're in the same ballpark here. It's fascinating, yeah. We're talking about a claim of superiority in odor control for diaper pails based upon testing. Testing, right. And because the claim is one of the new number one in odor control based on tests by an independent accredited laboratory, the claim is an establishment claim under the law of this circuit. There's a higher standard that's applied and different ways a plaintiff or a challenger can challenge an establishment claim than for a claim that doesn't rely on tests. It's a higher standard with good reason, because the courts have found and it is well known that consumers take claims that are based on tests more seriously, as well they should. If somebody's allowed to make a claim and say the tests support it, then a consumer is going to believe there's more veracity to that claim. Now, I stand here as a palant on a preliminary injunction and I acknowledge that the standard for reversing a preliminary injunction is a high one. But this court serves as a gatekeeper to prevent error, to protect the litigants at issue, but to protect the public interest, which is paramount under the Lanham Act and paramount in any preliminary injunction standard. Please, ma'am, this case is set for trial on the merits February the 14th of 2012. The earliest it will go to trial is February of next year. That's set as a jury trial, I believe. Yes, it is, Your Honor. Very well. Now, what that means is there's going to be another six months that this claim, at a minimum, is going to be out there in the marketplace when Playtex went in on preliminary injunction up front to try to stop it before it caused Playtex irreparable injury. If the decision of the trial court … And that's where the sales of Playtex come down? Well, Your Honor, at the time of the preliminary injunction and on the record that we have on this appeal, the answer to that question is we don't know. Of course, we're now standing here eight months later, and I don't think it's appropriate for me to go beyond the record that was before the court below, but Playtex was the market leader by far. As soon as this superiority claim got slapped on stickers on Munchkin's packaging, shelf space was shifting in the stores. These products were sold side by side in the stores. So I think that there's ample evidence in the record that there would be irreparable injury here. But I want to talk about what the parties don't dispute, if I might. The parties don't dispute that odor control is a material property in diaper pills, as they are in Catlett or Judge. They don't dispute that this court's decision in Southland governs. Playtex had three ways of satisfying its burden in Southland. It could show that the test doesn't establish with reasonable certainty the claim by attacking the validity of the test, by contradicting it by other tests, or showing that the test was irrelevant. Playtex did each of those three things in this case. Don't you really contend this is a test-proof claim? Yes. I don't think there's any dispute, but that this is a test-proof claim. I think the question is whether the tests, in fact, prove the claim. To look at that, we have to look at what is the claim. The claim is one of odor control. Munchkin says, oh, no, no, no, no. Odor control is not the human sensory perception of smell. Odor is smell. It's synonymous with smell. We've got a consumer product which expecting parents buy to stick in their nursery to try to make stinky diapers smell less. How can you credibly take the position, whether literally false on its face or literally false by necessary implication, that the reason that they slapped these stickers on this package is because they wanted to convince consumers that if they bought this product, their nurses would smell less. So they say, oh, no, this is not odor perception, this is odor control, and therefore we designed an analytical test that measured not odor, but odorants, and measured not control, but odorant recapture and odorant reduction. An odorant is something that causes an odor. They used ammonia. Ammonia isn't an odor. It may have an odor, but it itself isn't an odor. The test, therefore, that they designed doesn't prove the proposition that they asserted. That's the relevance problem of Statham. Next, the test has to be reliable. They conducted an analytical test which flouts basic scientific principles across the board. No replication of data. Any high school biology student knows that you've got to replicate your data in order to have valid test results. Two, no showing of statistical significance of data. Counsel, could you have tried to replicate the test? Was the test described in sufficient detail that you could have sent it out to a different lab and said, see if you can replicate these results? No. You couldn't have done that? We did not know, for instance, Judge, what concentration of ammonia they used. What they did was they poured ammonia in a beaker and put it in diaper pail at two stages of the test, and then they took a diaper and soaked it with ammonia. But that record doesn't show how much ammonia they put on the diaper? The test substantiation that they produced to us up front before this litigation didn't show the ammonia concentration. There are other examples, Judge, but how are we supposed to replicate a test without knowing what concentration of ammonia they used? Let me ask you, did not, in this case, the district court just accept or credit Munchkin's expert, Dr. Avaire, over your experts? And isn't that a decision that's just a factual determination? Your Honor, respectfully, the court credited Dr. Heber's testimony, Munchkin's expert, on some points over our experts. But that is only a narrow portion of the findings upon which the court based its ultimate decision. The court made numerous factual errors and legal errors that are in no way related to the expert testimony present. For instance, the court said that Munchkin used a hedonic curve to correlate the test data it got with sensory perception. Does it smell? Does it smell badly? Can I smell a difference? That's what a hedonic curve, I'm told, would do. But even Munchkin doesn't contend that it had a hedonic curve. It didn't use one. It didn't have one. That has nothing to do with what Dr. Heber testified as opposed to with what Dr. Stone and Dr. Ennis testified. The court below collapsed the standard on establishment claims, basically saying again and again that Claytex had to make an affirmative demonstration that the tests were either irrelevant or put in a contradictory test. And it's your position in a test-proof claim that that goes beyond the Ninth Circuit law. It's less than Ninth Circuit law in the sense that you can do it by putting in a contradictory test, you can do it by showing that the test is unreliable, and you can do it by saying the test doesn't support the proposition. Now, let's talk about putting in another test to show it's unreliable. I think that probably the single biggest error by the court below, among the numerous ones that we've pointed out in our briefs, was failing to think about what the fact that they had a sensory test, which they conducted first, which showed parity, not superiority, and they just sort of jettisoned that when it didn't come out right. They used malodor that's replicated diaper odor in that case, not just ammonia, which is a byproduct in some amount of urine degradation. They used a malodor that took account of both urine and feces, and infant diapers have both odors. Playtex submitted that sensory test. Munchkin didn't rely on it, but Playtex submitted it. It showed parity. So even under the judge's interpretation of the law, Playtex did affirmatively demonstrate contradictory test results. So we've got irrelevance of the test to support the proposition. We've got unreliability of the tests upon which the claim was being made, and we do have contradictory test results. Plaintiff, and any one of those under Southland, would have satisfied plaintiff's burden. I'd like to briefly talk about the words in a laboratory test, because the court below, and Munchkin's embraced this and taken it further, seems to feel that if you make an establishment claim, saying it's based on testing, and say that that testing was done in a laboratory, somehow or other it's a limitation on any requirement in the law, and on advertisers generally, that their tests replicate real-world usage. Then you say that establishes a dangerous precedent. More than just a dangerous precedent, Your Honor. I don't think that the words in a laboratory test are a limitation. They're things that make consumers believe the ad more. An independent, accredited laboratory performed this test well. If I see that, I think there's bona fides to the claim. You say that's no connection to the real world. None whatsoever. And I say that human baby diapers have lots of poop in addition to pee. And I say that... You put those diapers in those cans. What happens to them after that? Eventually, when the cans get filled, you open the can in one case, and you pull it aside in the other case, and you throw away the bag with all the diapers, but meanwhile... Where do you put that? In the trash? In the compactor? I don't know. I guess you throw it away. And that's the whole issue of people who use cloth diapers as opposed to disposable diapers. They take it out in a bag, and then they tie the bag. In one case, yes, Your Honor, that's true. Tie the bag, and they put it in the trash. I'm going to just end for now, because I would appreciate a moment or two, and rebuttal by saying that we've established irreparable injury. We've established likelihood of success. The public interest is important and paramount here. However, I think that this case does establish a very, very dangerous precedent, and I think it means that people can't come to court and get a preliminary injunction in a false advertising case without waiting months to do their own testing, to do survey evidence, and that's not the function that the courts are supposed to perform. There's a reason why you can get preliminary injunctions if you establish irreparable injury. Were there any tests done? I mean, surveys or going to a market, and you say they're side by side, and people come and say they buy one product, and then ask them, why did you buy this one? Why did you buy Playtex and not, what's the other one called again? Munchkin. Munchkin, yeah. Munchkin, or why did you buy Munchkin and not Playtex? See if anybody said that, well, I bought it because it says number one. Judge, the only time that you need survey evidence is when it's an implied message, not a literally false message, or a message that's literally false. I'm just asking you, that's all. At the time of the preliminary injunction, which was within three months of the time that Playtex first learned of this claim being made in the marketplace, no such survey evidence. Surveys take, you can do a crappy survey in six weeks, but they take several months to design, hire the interviewers, go out in the marketplace. That's why I really draw this distinction between what should be expected of a party on preliminary injunction, and what's expected at time of trial. And what we're talking about here is what's supposed to happen in the interim. What's fair, who's going to be hurt, can the hurt be remedied? And I submit for all the reasons that we've talked about, this is a case where there was clear error. This is a case of abuse of discretion, because there's so much wrong with the testing and with the analysis. This trial's set four months from now, in February. Mid-February. By my count, that's five months, and that assumes we really go in mid-February. We're mid-October now, close. Well, you know, with that being histrionic, every day that the claim stays in the marketplace, my client is irreparably injured. It was not for failure to try to get quick relief, both from the district court and from this court, that the claim continues to be out there. And frankly, the cycle of advertising claims, how long they're generally out there, is such that by the time we go to trial, they may well change their claim and come up with some other one. But in the meantime, are they going to come up with some other one that's going to be based on the same shoddy testing? Is all the discovery completed? No, Your Honor. We have completed sort of documentary discovery. We have not taken, apart from two third-party depositions of the lab in Hong Kong that conducted these supposed tests, we have not yet taken any depositions of the parties. We have a current cutoff date of discovery of, I believe it's November 24, October. Our expert discovery deadline is October 31, and we're on a real crash schedule, even given the amount of time that has passed. So while we want to go to trial ASAP, as long as there's no preliminary injunction in place, we're talking about both sides having a lot of work to do before we get there, and we're talking about a claim that causes injury in the marketplace. We went in when they stickered the product and they could have pulled the stickers off. I appreciate all the time I got. I apologize for going over, and I thank the Court for your attention. Thank you. Good morning, Your Honors. May it please the Court. Cameron Garrison on behalf of the Appellate in Munchkin. I think what we're looking at here, at least from Munchkin's perspective, is two inquiries and possibly a third. The two that are certainly in place is whether the Court applied the proper standard when it accurately recited the South and South standard, including the South and South admonition that a party seeking to meet its burden must do more than show the test supporting the challenge's claims are unpersuasive. The second issue is whether the District Court acted in its discretion after evaluating both sides' evidence that was submitted in determining that Playtex's evidence was not persuasive and it failed to meet its burden of likelihood of success. Let me ask, how do you get around the fact that the District Court here repeatedly held that Playtex must prove or provide affirmative evidence despite the fact that this is what is called a test-proof claim? How do you get around that under the Southland-Sod case? Well, I think, Your Honor, what Southland-Sod said, which is consistent with the case law on which it relied, is really there's three things that can happen, three ways that Playtex can meet its burden, and Ms. Paul accurately recited those during when she was speaking. You can either attack the validity of the test directly, you can show that the tests are contradicted or unsupported by other tests, and you can show that the tests don't establish the proposition asserted by the defendant. What this affirmative proof or this something more that the court cited and which Playtex has criticized as being inaccurate, what this something more is, it's not a requirement for a contradictory test or anything like that. What it is, it's an acknowledgment of the case law underneath that says in no uncertain terms, you can't just criticize the methodology here. You have to do something more. Simple methodological critiques do not meet the burden. And so when they said that they have to make an affirmative showing or do this something more, that's what the court was referring to. If you look at Southland-Sod, Southland-Sod specifically says, you must do more than just show that the challenge test is unpersuasive. The case that Southland-Sod relied on, largely the McNeil case out of the Second Circuit, it is, again, makes clear you must do more than show the tests are unpersuasive. And it goes on to, it says that expressly. In the McNeil case, that's a Tylenol case, as I recall. Yeah, it's Excedrin. Excedrin and Tylenol. Yes, sir. In that case, were there not two claims, one a test-proved claim and one a claim that did not involve a test? Well, I believe that's correct, Your Honor. But in evaluating the test-proved claim, what the court relied on was it wasn't a methodological critique of the test that supported the claim. The reason the court issued the injunction is because what it saw and what the plaintiff proved in that case was that the test that supposedly supported the claim actually didn't test one of the products that was asserted in the claim. Claim said, you know, A is better than B, but test tested A versus C. And so that was that affirmative showing that's something more that the court required. In fact, what the court said in considering that was it credited the plaintiff there for, quote, doing more than merely critiquing and exposing the methodological weaknesses of the supporting study. This is where, when you look at the three ways that they could show that the test doesn't support the claim, this is the third test, the one where you show that the test don't establish the proposition asserted by the claim. So claim said, A is better than B, but test tests A versus C. And so that's the reliance that, that's what the court in McNeil relied on. And that actually is directly relevant to what you're asking. What is this something more? And it's got to be this something more than just saying, oh, we don't like the methodology that you've used. Well, we concede in the case of Judas we're talking about a test-proved claim. Yes, Your Honor. Very well. I think turning to the third factor that we may need to consider today, and from our perspective we don't know that we need to, but I think the third thing that is important is if the court reaches this point, whether or not the issues that the district court did not reach, such as the unclean hands defense, the failure by play text to even attempt to establish irreparable injury, which I believe was addressed a little bit in the preceding talk, whether those provide alternative grounds for affirmance in the event the court reaches that event. But I think the important thing that we need to do here is separate out what is the legal standard discussion from what the factual issues are. Obviously, there's a different standard of review. We're looking at the legal recitation under de novo review, but the factual findings of the court need to be shown as clearly erroneous in order to be reversed. And from our perspective, play text is trying to conflate those two. Obviously, they prefer the de novo review versus the clearly erroneous standard, and so there's an effort here to conflate those two issues in order to paint some of the factual findings of the court as in fact being findings of law. But it's important that we separate these out because the case law shows that it makes clear that as long as the district court got the law right, which here the district court absolutely got the law right, then the case will not be reversed simply because the appellate court would have arrived at a different result if it applied the law that affects the case. What do you say about the application of the serious question standard after the United States Supreme Court case of Winter and then a case in the Ninth Circuit Alliance for the Wild Rockies where it said that the serious question standard survives winter? And in this case, in our case today, the district court, while initially reciting the law, never actually applied the serious question standard within the winter framework. If that was a concern in the Alliance for the Wild Rockies concerning the district court's failure to apply the serious question standard, isn't that the same concern we have in this case, in our case today? Well, Your Honor, I think the court did. If you look at everything that the underlying court did here, I think that there's no question that they evaluated whether this was a serious question. In the very first part, the opening of the district court's opinion, he says that the serious question standard survives, but I don't find any way in that opinion where he did any analysis of the serious question. Well, I guess what I would refer to is the extent to which the court undertook all of the review here. There were really three separate bites at the apple. There was a TRO motion, which the court considered in detail and denied. There was the initial preliminary injunction motion, which the court considered and issued a preliminary ruling denying that. We received that at the hearing, and then upon request from PLATEX, the court then provided even more opportunity for PLATEX to cite its best cases, to submit its best evidence from the depositions that were taken. There were, in fact, six additional depositions taken in the preliminary injunction context for the declarants that supported the competing motions. And given all those different opportunities, I certainly think that it's clear that the court addressed whether this is a serious question, evaluated the totality of circumstances, and certainly gave PLATEX every opportunity to make that serious question showing. And based on the ruling, I think it's that the district court just did not find that the showing was made. As Your Honor referenced, it was simply a matter of, if you go through the whole, there's 20 pages single spaced of that ruling, and it is point by point evaluating the evidence of their expert versus our expert and, again, crediting our experts. And that's within the court's discretion. Those are findings of facts, and the court, in its discretion, credited Dr. Heber and his testimony. Did you say your test had any relation to a real world setting? I think it does, Your Honor. In fact, the court addresses that in the order. Certainly, the point of the test was to test the odor control capturing ability of these pails. Which one of these captured the odor best? Let's find an analytical test, a test when you can take actual measurements, remove the subjectivity of human involvement, and measure how each of these pails are performing in controlling this odor. But we go beyond that. Dr. Heber has a couple points to that effect. He cites a study from Oxford, and he cites some other issues, some other studies, not specifically, but he specifically cites an Oxford study that shows the parts per million of ammonia and where humans can perceive that. And he identifies it as, I believe, two to three parts per million. The findings that were taken in our test show that the competing pails all came in over that level. And so based on the studies, there is a human perception aspect to it, because he's saying, yes, humans are going to perceive this odor at the level that it's being released. And the court acknowledges that testimony, credits that testimony in its discretion. And so while I don't necessarily agree entirely with the premise that we had to go that far, because we carefully crafted this claim to make sure that it accurately reflected the test that was done. But nevertheless, there is certainly testimony from Dr. Heber, which was properly credited by the court, that applies, you know, shows the real-world application. Counsel, under the Lanham Act, is there any possibility of damages? Is that a damage provision? Is that an injunctive relief only? There is the possibility of damages. And in fact, each party, we have competing claims here, both on these odor control claims that each party made, as well as there's a preference claim, moms prefer this two to one that we've made. And each party is seeking damages as well. What's your position, despite the use of the word potential in Playtex's brief? Hasn't it still demonstrated a likelihood of irreparable harm due to the alleged intangibles, such as goodwill and business reputation? I don't think it has, Your Honor. I think that Playtex's underlying briefing is telling on this. It seems from my reading of Playtex's underlying briefing, that they didn't even address the issue of whether they had been irreparably harmed. They presumed that that harm would be found. I think this is an issue that's certainly at least somewhat in flux because of the eBay case from a few years ago, and where we stand on how the eBay finding in terms of irreparable harm in a permanent injunction context is going to extrapolate down to, and that's on a patent case, to extrapolate down to all the other cases in all the different contexts. But I certainly would think to the extent, and courts around the country are obviously starting to adopt the eBay standard in a lot of different contexts. When we're talking about a preliminary injunction here, an extremely high standard, that must be shown in order to obtain a preliminary injunction, certainly if there's any case in which eBay should be extrapolated down, it's in this context. And yet Playtex didn't make that showing. They didn't really even try to make that showing. They just presumed that the harm would be there. I think that, and we've touched on this somewhat, but I think where Playtex's argument goes astray is in terms of the claim that the court was requiring them to make some sort of affirmative showing, to submit its own test. They say that the court erred on the law because it required Playtex to submit its own test. That's simply not what the decision did. The decision looked at the three methods through which they could establish literal falsity, attacking the validity of the tests, showing the tests are contradicted or unsupported by other tests, showing the tests don't establish the proposition asserted by the defendant, and then saying, well, you didn't submit an alternative test. You didn't run your own test. And so because of that, there are only two ways that you can do it. And that's why the court said that Playtex, it required Playtex to affirmatively demonstrate through an analysis of Munchkin's tests and data either that Munchkin's product does not control odor better than its own product or that Munchkin's study or test is irrelevant. That's the first way and the third way in the three ways. It took out the second because Playtex didn't, well, I shouldn't say Playtex didn't conduct its own tests. Playtex didn't submit its own tests. The court asked whether Playtex had conducted its own tests or tests. The underlying record on this motion establishes that, yes, in fact, those tests were conducted. There's testimony that up to 10 of those tests were conducted. None were submitted in the preliminary injunction context. Now, discovery has gone on since. We have received at least four of those tests. And while, you know, I'm not going to refer to what's not in the record here, I'll just emphasize that Playtex did not submit the tests even though they acknowledged in the underlying record that they had conducted them. I think briefly addressing a few of the points that counsel made in her argument, there was mention of the hedonic curve and how the underlying court improperly credited or referenced testimony regarding the hedonic curve in terms of whether or not Munchkin's test had real-world application. I think I'll refer back to the conversation we had earlier where, in fact, the court credited two other things from Dr. Heber, his Oxford article as well as his other references in terms of the human perception of two to three parts per million of ammonia. So there were other methods through which the underlying court properly credited Dr. Heber's testimony in establishing, to the extent that's necessary, real-world application. Thank you. And if the court has no further questions. Thank you. Thank you. All right. Go ahead. You got something you need to tell us? Thank you. I think that simply because, with due respect to our district court judges, the judge below wrote a 20-page opinion and had oral argument. This was all on papers. There were no witnesses. It doesn't mean the judge got it right in this particular case. I think this is a case, to use the vernacular, where there's a failure to see the forest for the trees. I think if you look at each individual thing that the court below said, he never stepped back and looked at the totality of the problems with the tests. He never looked at the fact that there was a sensory test. I don't intend to go down the road of talking about things that are not in the record on this preliminary injunction. But I want each of you to be aware that we do not accept, do not agree, with Mr. Garrison's characterization of what he learned in discovery about testing after the preliminary injunction. We disagree. However, it's not part of the record that's before this court at this time. It is not true that we relied on a presumption of irreparable injury below. The record has multiple declarants who had their depositions taken with respect to the specifics of the irreparable injury, to goodwill, as you pointed out, Judge Davidson, to Play, Texas, Goodwill, Infant Care, and generally to shelf space in the industry, to NCAPs that were going on at the time, to products sold side-by-side in the marketplace with respect to a claim that makes a direct superiority claim on a product comparison basis. There is multiple evidence in this record of the many ways in which the injury, yes, we have a damage claim, but the injury will be largely incalculable. How do we know how many people bought Munchkin's pail? Because it was the new entrant into the market and came in with a splash and an aggressive marketing pitch. As opposed to how many people bought the pail? Because they saw the sticker saying it was better at odor control. Bear in mind that once consumers buy these pails, they're locked in for as long as their kids are in diapers to buying refills for the pail, because there's no interchangeability here. They don't fit each other's pails. I'm glad, Judge, that you pointed out the serious questions standard. I think that we established likelihood of success, but the judge didn't even apply. Yes, he recited the standard, including serious questions, never applied it, just like he recited the Southland standard and then misapplied it. Sorry, Judge. As I recall, the opening of the opinion said that the serious question standards survive winter, but it was never mentioned after that. Never mentioned, never applied. And not only is Playtex suffering injury in the real world, but there's nothing about Munchkin's tests that comport with real world. Consumers, people, mothers with babies, fathers with babies, grandparents with babies, don't leave diaper pails open for 10 to 30 minutes at a time. Diapers, once they're soiled, aren't soaked with urine. They're not soaked with, well, they might be soaked with urine. I meant to say they're not soaked with ammonia. The tests have to comport with real world usage, and why in the world would Munchkin say in its claim, when used in accordance with manufacturer's instructions, unless they were telling consumers loud and clear, this is how it's going to work in your home. This test supports that claim. Buy our product instead of buying Diaper Genie, Playtex's product. I think that this court has a responsibility to monitor error. I think this case demonstrates error, and I urge the court to reverse as promptly as possible, given what's going on in the marketplace. I thank you for your time. Unless the court has any further questions. I want to make an observation. Go ahead. I don't have a question. No. I don't want any further questions. Thank you very much. Appreciate it. With that. Let me make an observation. Sure. I just want to commend counsel for both sides in this case for not subjecting the court to a sniff test today, a reality test. Thank you for that. I'll make an observation, too. This other case I had involving Johnny Cat and another brand, I learned a very, very comforting fact, and that is that this nation has a vast reserve of Sarasitic clay out of which those products are mined, and that reserve extends from the western border of the San Joaquin Valley all the way up to the Bay Area. We have that enormous reserve. And so that puts us in a very comfortable position when we think about the vast reserves of oil that the Saudis have. We have a monopoly on kitty litter, on oil. All right. Very comforting, at least to the cats. All right. I've been waiting to say that for 50 years. Okay. Find the opportunity. Yeah. Okay. All right. Jay Bybee, Alyssa Peterson, Specialist of Resupport. Alyssa Peterson, sit down. We're going to get out of here. Get up. Take her out of here. Hang on. You be quiet. You've got a big mouth. We listen to you all the time. No, no. No. Yeah, no. No. No. No. No. No. Hell, yeah. You're driving me crazy. Go. Yeah. Go. Go. Go. Go. Go. Go. Go. You ruined my weekend. What? Yeah, it's mine. Yeah. You bother me. Shame on you. Shame on you. We always have excitement. That's why we have a curtain. See? All right. This part of this session stands adjourned.
judges: Davidson, Pregerson, Bybee